# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **ROGER NAPPIER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:16-cv-1208-MHH** |
| | } | |
| **NANCY A. BERRYHILL,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. § 405(g), plaintiff Roger Nappier seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Mr. Nappier's claims for a period of disability and disability insurance benefits. After careful review, the Court affirms the Commissioner's decision.[1]

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. (*See* https://www.ssa.gov/agency/commissioner.html). Therefore, the Court asks the Clerk to please substitute Ms. Berryhill for Carolyn W. Colvin as the defendant in this action. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. Later opinions should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

# I. PROCEDURAL HISTORY

Mr. Nappier applied for a period of disability and disability insurance benefits on February 7, 2013. (Doc. 6-6, pp. 2-3; Doc. 6-7, p. 2). Mr. Nappier alleges that his disability began on June 1, 2011. (Doc. 6-4, p. 3). The Commissioner initially denied Mr. Nappier's claims on July 9, 2013. (Doc. 6-5. pp. 2-6). Mr. Nappier requested a hearing before an Administrative Law Judge (ALJ). (Doc. 6-3, p. 34; Doc. 6-5, p. 9). The ALJ issued an unfavorable decision on December 4, 2014. (Doc. 6-3, pp. 8-22). On May 25, 2016, the Appeals Council declined Mr. Nappier's request for review (Doc. 6-3, pp. 2-4), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

# II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as

adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If the ALJ's factual findings are supported by substantial evidence, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III. SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of

Impairments; (4) based on a residual functional capacity (RFC) assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Mr. Nappier "has not engaged in substantial gainful activity since June 1, 2011, the alleged onset date." (Doc. 6-3, p. 13). The ALJ determined that Mr. Nappier suffers from the "following severe impairments: multilevel mild degenerative dis[c] disease of the thoracic spine, mild multilevel thecal sac stenosis of the thoracic spine, diabetes mellitus with retinopathy, and ophthalmological impairments of superior ischemic HRVO right eye with macular edema, chronic venous insufficiency OU possibly with early macular edema OS on OCT, diabetes mellitus with mild NPDR OU with macular edema, steroid responder with good IOP, cataracts OU, and central retinal vein occlusion." (Doc. 6-3, p. 13). The ALJ determined that Mr. Nappier has the following non-severe impairments: moderate carpal tunnel syndrome on the left, dyslipidemia, a history of kidney stones, and depression. (Doc. 6-3, pp. 13-14). Based on a review of the medical evidence, the ALJ concluded that Mr. Nappier "does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Doc. 6-3, p. 15).

In light of Mr. Nappier's impairments, the ALJ evaluated Mr. Nappier's residual functional capacity or RFC. The ALJ determined that Mr. Nappier has the RFC to perform:

> medium work as defined in 20 CFR 404.1567(c) except he is able to frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs but may never climb ladders, ropes, or scaffolds. He is able to work in an environment that does not require work at unprotected heights or with hazardous machinery. The claimant is able to determine differences in size, shape, and color of objects; is able to avoid ordinary hazards; and is able to perform tasks that do not require more than occasional depth perception.

(Doc. 6-3, p. 16). Based on this RFC, the ALJ concluded that Mr. Nappier is not able to perform his past relevant work as a finish carpenter and cabinet maker. (Doc. 6-3, p. 21). Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Mr. Nappier can perform, including laundry worker, cleaner, and scrap sorter. (Doc. 6-3, pp. 21-22). Accordingly, the ALJ determined that Mr. Nappier has not been under a disability within the meaning of the Social Security Act. (Doc. 6-3, pp. 22).

## IV. ANALYSIS

Mr. Nappier argues that he is entitled to relief from the ALJ's decision because the ALJ did not properly evaluate his subjective testimony consistent with the Eleventh Circuit Pain Standard and because the ALJ did not give adequate weight to the opinion of treating physician Dr. Vlad Prelipcean. The Court examines each issue in turn.

## A. SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S REJECTION OF MR. NAPPIER'S SUBJECTIVE PAIN TESTIMONY.

"To establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'" *Zuba-Ingram v. Comm'r of Social Sec.*, 600 Fed. Appx. 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)). A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted). If the ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225; *see* SSR 16-3P, 2016 WL 1119029 at *9 ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").[2]

_____

[2]On March 28, 2016, SSR 16-3p superseded SSR 96-7p, the ruling concerning subjective complaints about pain that was in effect when the ALJ issued a decision in this case. 2016 WL 1237954, at *1. SSR 16-3p "provides guidance about how [the Social Security Administration]

At his administrative hearing, Mr. Nappier testified that he has a constant pain "[r]ight up and down the middle of [his] spine." (Doc. 6-3, pp. 55-56). He testified that this pain increases throughout the day, once he "get[s] stirring around and stuff." (Doc. 6-3, p. 45). Mr. Nappier testified that he can stand and sit for one hour at a time and lift less than ten pounds. (Doc. 6-3, pp. 56-57). To manage his pain, Mr. Nappier takes Lortab once a day "as needed." (Doc. 6-3, p. 44). In addition, Mr. Nappier testified that he takes an aspirin every day and tries to manage his back pain by taking two Aleve and lying flat on his back to avoid becoming "dependent on the pain meds." (Doc. 6-3, p. 45). Mr. Nappier explained that neither physical therapy nor an epidural block has helped his back pain, and he described the epidurals as a "waste of money and time." (Doc. 6-3, pp. 56, 58). Mr. Nappier testified that the epidurals raise his blood sugar. (Doc. 6-3, p. 59).

The ALJ accurately summarized Mr. Nappier's testimony concerning his back pain. (Doc. 6-3, p. 17).[3] The ALJ applied the correct legal standard when

evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." 2016 WL 1119029, at * 1. SSR 16-3p eliminates the term "credibility" from social security policy but does not change the factors that an ALJ should consider when examining subjective pain testimony. *See* 2016 WL 1119029, at *7. SSR 16-3p merely provides clarification of the subjective pain standard; it does not substantively change the standard. On the record in this case, the Court does not have to decide whether SSR 16-3p applies retroactively because the ALJ's decision meets the standards of both SSR 96-7p and SSR 16-3p.

[3] Mr. Nappier does not challenge the ALJ's findings with respect to his diabetes mellitus, visual impairments, mental illness, or carpal tunnel syndrome. (Doc. 11, pp. 5-9).

examining Mr. Nappier's subjective complaints. The ALJ explained that Mr. Nappier's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but Mr. Nappier's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (Doc. 6-3, p. 17). Specifically, the ALJ found that "[t]he objective evidence does not support [Mr. Nappier's] allegations of disabling pain." (Doc. 6-3, p. 19). The ALJ also found that Mr. Nappier's conservative treatment history, stable clinical findings, and daily activities undermine Mr. Nappier's allegations concerning the severity and frequency of his symptoms. (Doc. 6-3, p. 17). Substantial evidence supports the ALJ's rejection of Mr. Nappier's subjective pain testimony.[4]

According to the record, Mr. Nappier first reported back pain during a January 14, 2010 visit with his treating physician, Dr. Prelipcean. (Doc. 6-12, p. 12). Dr. Prelipcean found that Mr. Nappier had a limited range of motion, tenderness bilaterally, and palpable muscle spasms. (Doc. 6-12, p. 13). Mr. Nappier's straight leg raise test was negative bilaterally. (Doc. 6-12, p. 13). An x-

---

[4] Although the ALJ used the term "credible," the ALJ did not base her findings on evidence in the record that was unrelated to Mr. Nappier's impairments, and she did not assess whether Mr. Nappier generally was a truthful person. Instead, consistent with SSR 16-3p, the ALJ reviewed Mr. Nappier's testimony about his pain, the objective medical evidence in the record as a whole, and Mr. Nappier's activities of daily living. (Doc. 6-3, pp. 17-21). Mr. Nappier has not argued that SSR 16-3p applies retroactively, but even if it does, the ALJ's assessment of Mr. Nappier's subjective testimony is consistent with SSR 16-3p.

ray of Mr. Nappier's thoracic spine revealed small bone spurs but no fractures and only mild degenerative changes. (Doc. 6-12, p. 14). Dr. Prelipcean diagnosed back pain, but he did not prescribe pain medication or other therapy to treat Mr. Nappier's back pain. (Doc. 6-12, p. 14).

Mr. Nappier saw Dr. Prelipcean on February 1, 2010 and complained of "chronic back pain." (Doc. 6-12, p. 16). The results of Mr. Nappier's physical examination were consistent with a limited range of motion, tenderness bilaterally, and palpable muscle spasms. (Doc. 6-12, p. 17). Mr. Nappier again had a negative leg raise test. (Doc. 6-12, p. 17). Dr. Prelipcean prescribed Celebrex, Lortab, and Robaxin to treat Mr. Nappier's back pain. (Doc. 6-12, p. 16). In May 2010, Mr. Nappier complained of intermittent pain on the left side of his back. (Doc. 6-12, p. 19). Dr. Prelipcean's treatment notes state that Mr. Nappier's "condition [was] stable overtime." (Doc. 6-12, p. 19). Dr. Prelipcean maintained Mr. Nappier's prescriptions. (Doc. 6-12, pp. 20-21). Although Dr. Prelipcean stated that he would arrange an epidural block, there is no evidence in the record that Mr. Nappier received an epidural block at that time. (Doc. 6-12, p. 20).

On August 16, 2010 and October 21, 2010, Mr. Nappier saw Dr. Prelipcean again. (Doc. 6-12, pp. 23, 25). Mr. Nappier did not complain of back pain during these visits, and Dr. Prelipcean did not examine Mr. Nappier's back. (Doc. 6-12, pp. 23-28). Still, Dr. Prelipcean continued Mr. Nappier's prescriptions for

Celebrex, Lortab, Robaxin, and Mobic to treat Mr. Nappier's back pain. (Doc. 6-12, pp. 24, 27-28).

During a December 27, 2010 visit with Dr. Prelipcean, Mr. Nappier complained of chronic low back pain. (Doc. 6-12, pp. 29-30). Dr. Prelipcean's treatment notes state that Mr. Nappier had recently engaged in "heavy lifting." (Doc. 6-12, p. 29). Dr. Prelipcean's examination of Mr. Nappier's back revealed a limited range of motion, tenderness bilaterally, and palpable muscle spasms. (Doc. 6-12, p. 30). Mr. Nappier had a negative leg raise test. (Doc. 6-12, p. 30). Dr. Prelipcean found that Mr. Nappier's back "condition [wa]s stable," and Dr. Prelipcean instructed Mr. Nappier "to continue [his] current care." (Doc. 6-12, p. 31). Dr. Prelipcean prescribed Celebrex, Lortab, Robaxin, and Mobic. (Doc. 6-12, p. 31).

During a doctor's visit on January 24, 2011, Mr. Nappier complained of "head congestion, sinus drainage, and cough" but not back pain. (Doc. 6-12, p. 33). Although Dr. Prelipcean found a limited range of motion, tenderness bilaterally, and palpable muscle spasms, Dr. Prelipcean concluded that Mr. Nappier's back pain had improved, and Dr. Prelipcean instructed Mr. Nappier "to continue with current care." (Doc. 6-12, p. 35). Dr. Prelipcean maintained Mr. Nappier's prescriptions for Celebrex, Lortab, Robaxin, and Mobic. (Doc. 6-12, p. 36).

Mr. Nappier did not see Dr. Prelipcean again until November 2011. (Doc. 6-12, p. 38). Mr. Nappier sought treatment for a sinus infection. (Doc. 6-12, p. 38). He also wanted a flu shot. (Doc. 6-12, p. 38). Dr. Prelipcean examined Mr. Nappier's back and found a limited range of motion, tenderness bilaterally, palpable muscle spasms, and a negative leg raise test. (Doc. 6-12, p. 39). Dr. Prelipcean diagnosed back pain and prescribed Celebrex, Lortab, Robaxin, and Mobic. (Doc. 6-12, pp. 40-41).

Mr. Nappier saw Dr. Prelipcean again on February 14, 2012. (Doc. 6-12, p. 42). Mr. Nappier's complained of "middle back pain and pain between the shoulders," and Dr. Prelipcean found palpable muscle spasms, tenderness bilaterally, a limited range of motion, and negative straight leg raising. (Doc. 6-12, pp. 42, 44). Dr. Prelipcean discontinued Mr. Nappier's Celebrex prescription and replaced it with Daypro. (Doc. 6-12, pp. 42, 45).

When Mr. Nappier visited Dr. Prelipcean in August 2012, Dr. Prelipcean noted that Mr. Nappier's back pain had improved. (Doc. 6-12, p. 50). Dr. Prelipcean discontinued Mr. Nappier's prescriptions for Lortab 5 and Robaxin. (Doc. 6-12, p. 46). Mr. Nappier saw Dr. Prelipcean in November 2012 for "fever, sinus drainage, sore throat, chest congestion and body aches"; Mr. Nappier did not report back pain. (Doc. 6-12, p. 51). Dr. Prelipcean did not examine Mr.

Nappier's back, but he continued Mr. Nappier's prescription for Lortab 7.5 and Daypro. (Doc. 6-12, pp. 52-53).

In February 2013, Mr. Nappier reported that his chronic back pain had returned, and he denied relief from physical therapy. (Doc. 6-12, p. 54). Dr. Prelipcean did not examine Mr. Nappier's back, but he ordered MRIs of Mr. Nappier's lumbar and thoracic spine. (Doc. 6-12, pp. 55, 57). The MRI results were negative and demonstrated no disc herniation, spinal canal stenosis, or nerve impingement. (Doc. 6-12, pp. 59-60). Dr. Prelipcean reported in a February 11, 2013 progress note that "X-rays an[d] MRIs of [Mr. Nappier's] back did not show a whole lot of degenerative changes or fractures," and he did "not believe [Mr. Nappier's] pain [wa]s related to underlying malignancy as it's always relieved by rest and never bothers him at night." (Doc. 6-15, p. 38).[5]

On June 18, 2013, Mr. Nappier reported to Dr. Frederick Ernst, a consultative examiner, that he experienced an achy pain in his lower back during a straight leg raising test of his left leg. (Doc. 6-14, p. 22). Straight leg raising of Mr. Nappier's right leg did not cause pain, a Romberg test was negative, Mr. Nappier's gait and heel-to-toe were normal, he retained full motion of his spine, and he maintained full strength throughout Dr. Ernst's examination. (Doc. 6-14,

---

[5] Dr. Srinivas Mallempati of Alabama Orthopedic, Spine & Sports Medicine Associates, who also reviewed the February 2013 MRI, described the images as "unremarkable." (Doc. 6-14, p. 50).

pp. 21-22).  Mr. Nappier told Dr. Ernst that he took Lortab for his back pain one to

two times a day "as needed" and baby aspirin.  (Doc. 6-14, p. 20).

On December 9, 2013, Mr. Nappier saw Dr. Mallempati at Alabama

Orthopedic, Spine & Sports Medicine Associates.  (Doc. 6-14, p. 49).  Dr.

Mallempati noted that:

> [Mr. Nappier's] symptoms have been present for [three] years. He
> describes the symptoms as burning, stabbing[,] and aching.  The
> symptoms are worse during the day.  Additional symptoms include
> ROM limitation. Since the onset, the symptoms are worsening.
> Symptoms are made worse with activity.  The symptoms are relieved
> while resting.  Other activities or actions that cause the symptoms to
> feel better are: lying flat on back.

(Doc. 6-14, p. 49).  Mr. Nappier rated his "moderate" upper back pain as a four out

of ten and his midline thoracic pain as a five out of ten.  (Doc. 6-14, p. 49).

Thoracic examinations showed a decreased range of motion, but Dr. Mallempati

did not describe the degree of limitation.  (Doc. 6-14, pp. 50-51).  Additionally, Dr.

Mallempati's examinations showed no paraspinal spasms, grossly normal strength

in Mr. Nappier's lower extremities, normal sensation to touch, no step-off or

bruising, normal thoracic alignment, and a negative Spurling's test.  (Doc. 6-14,

pp. 50-51).  Dr. Mallempati diagnosed Mr. Nappier with thoracic pain, thoracic

degenerative disc disease, and thoracic spondylosis.  (Doc. 6-12, p. 50).  Dr.

Mallempati explained that Mr. Nappier "did not get good relief of symptoms with

conservative management including but not limited to NSAIDs, pain medication-

Hydrocodone for [four] weeks, did physical therapy for [four] weeks[,] etc." (Doc. 6-14, p. 50). An MRI revealed multilevel mild thecal sac stenosis, "due to prominent posterior epidural fat." (Doc. 6-12, p. 53). The MRI also revealed mild multilevel degenerative disc disease but no disc extrusion, cord compression, or severe central canal stenosis. (Doc. 6-14, pp. 53-54). Additionally, Mr. Nappier's "neural foramina [were] grossly patent." (Doc. 6-14, pp. 53-54).

Dr. Mallempati reviewed the MRI findings with Mr. Nappier during a follow up visit on December 11, 2013. (Doc. 6-14, p. 51). Although present at the midline two days earlier, no tenderness was detected during Mr. Nappier's follow-up examination. (Doc. 6-14, p. 51). The December 11, 2013 thoracic examination also revealed neutral sagital and coronal balance, negative straight leg raising, full strength testing in all areas tested, and sensation intact to sharp and soft touch at all dermatomal distributions. (Doc. 6-14, p. 51). Dr. Mallempati arranged for an epidural injection to see if it "would help relieve some pain." (Doc. 6-14, p. 52).

After reviewing Mr. Nappier's longitudinal treatment history, the ALJ provided specific reasons supported by objective medical evidence for rejecting Mr. Nappier's subjective complaints of pain. Although Dr. Prelipcean documented consistent clinical findings of muscle spasms, tenderness, and a limited range of motion, he never restricted Mr. Nappier's activity. (Doc. 6-12, pp. 13, 17, 20, 30, 35, 39, 44, 47; Doc. 6-15, pp. 30, 32, 45). Dr. Prelipcean recommended

conservative treatment methods, and, over time, he reduced Mr. Nappier's prescribed medication. (Doc. 6-12, pp. 16, 19, 23, 25, 29, 33, 42, 45, 46, 50; Doc. 6-14, p. 20). Dr. Prelipcean did not order surgery to treat Mr. Nappier's back pain. (Doc. 6-3, pp. 56,58; Doc. 6-12, pp. 20, 24; Doc. 6-14, pp. 50, 54).

Therefore, substantial evidence supports the ALJ's decision to reject Mr. Nappier's subjective complaints of severe back pain. *See Quick v. Comm'r of Soc. Sec.*, 403 Fed. Appx. 381, 384 (11th Cir. 2010) (ALJ did not err by discrediting the claimant's subjective testimony about extreme back pain in light of his lack of complaints during the relevant period as well as various declarations of improvement that supported a finding of diminished credibility concerning the claimant's testimony about "the persistence, intensity, and limiting effects of his symptoms."); *Reynolds v. Wilson*, 2016 WL 1117688, at *9 (N.D. Ala. 2016) (internal citations omitted) (affirming ALJ's rejection of the claimant's subjective complaints of pain where an MRI showed "a mild disc desiccation that did not warrant surgical intervention and no cord or nerve root compromise," another MRI "showed no significant abnormalities," "treatment notes often stated that [the claimant] was in a stable condition or showing signs of improvement," and a physician's note reported full range of motion despite tenderness.).

In addition to the objective medical evidence, the ALJ noted inconsistencies between Mr. Nappier's subjective complaints of pain and his daily activities. Mr.

Nappier reported in February 2013 that he took 2-3 Lortabs a day during the week, but on weekends, he managed his back pain by taking only Advil and Tylenol. (Doc. 6-12, p. 55; Doc. 6-15, p. 33). In July 2012, Mr. Nappier reported working under his car, and in February 2013, he reported that he is able to drive. (Doc. 6-13, pp. 6, 18). In a March 2013 function report, Mr. Nappier explained that his back pain prevents him from standing, bending, and lifting materials. (Doc. 6-7, p. 23). He also reported that he takes a short nap some days because of his medication. (Doc. 6-7, p. 23). But Mr. Nappier also reported that he is able to go on a short walk some days, and he is able to walk a quarter of a mile before stopping to rest for five minutes. (Doc. 6-7, pp. 23, 28).

Mr. Nappier completes household chores, such as using a riding lawn mower to mow the lawn for thirty minutes every two weeks, performing other light yard work, doing light laundry once a week for between thirty and forty-five minutes, shopping for groceries and necessities once weekly for an hour, taking out the trash, and feeding and caring for his pet. (Doc. 6-3, pp. 23-27). Although Mr. Nappier reported a change in his cooking habits since the onset of his alleged symptoms, he did not explain this degree of change. (Doc. 6-3, p. 24).

Mr. Nappier reported that his pain does not affect his personal care and that he is able to prepare his own meals, drive himself to the grocery store and doctor's office, and go on walks without assistance. (Doc. 6-3, p. 24). Mr. Nappier stated

that he visits his mother once or twice a week and spends time with his wife, children, and grandson weekly. (Doc. 6-2, pp. 26-27). Mr. Nappier further explained that he is able to pay attention for three to four hours at a time, depending on his medication, and follow written and spoken instructions well. (Doc. 6-3, p. 28). Furthermore, in June 2013, Mr. Nappier reported to Dr. Ernst that he tried to walk one mile three times a week and continued to perform some light household chores. (Doc. 6-14, p. 19). In October 2014, Mr. Nappier reported that he drove twenty minutes to his hearing. (Doc. 6-3, p. 42).

The ALJ provided specific reasons supported by Mr. Nappier's daily activities for rejecting his subjective testimony regarding his alleged back impairment. Therefore, substantial evidence supports the ALJ's reasons for rejecting Mr. Nappier's subjective complaints of pain. *See Dyer v. Barnhardt*, 395 F.3d 1206, 1209 (11th Cir. 2005) (The ALJ found Mr. Dyer's subjective complaints inconsistent with his reported performed daily activities, including his ability to "mow the lawn, read, iron, drive, watch television, feed and pet his dog, shop, and perform some 'limited maintenance' household chores.").

In support of his argument that the ALJ failed to properly evaluate his subjective complaints of pain, Mr. Nappier contends that the ALJ's determination that Mr. Nappier can perform medium work, which requires lifting no more than 50 pounds at a time and frequent lifting or carrying of objects weighing up to 25

pounds, is inconsistent with the medical evidence. (Doc. 11, pp. 7-8). In determining Mr. Nappier's RFC, the ALJ recognized that Mr. Nappier has "limitations [that] erode the unskilled medium occupational base." (Doc. 6-3, p. 22). The ALJ considered the vocational expert's testimony in identifying jobs in the economy that Mr. Nappier may perform despite the compromised medium exertional level. (Doc. 6-3, p. 22). Although Dr. Prelipcean and Dr. Ernst identified restrictions that support Mr. Nappier's contention that he cannot lift up to 50 pounds at a time or frequently lift and carry up to 25 pounds, as explained below, it was within the ALJ's discretion to reject those restrictions.

**B.    SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DECISION TO GIVE DR. PRELIPCEAN'S OPINION LITTLE WEIGHT.**

An ALJ must give considerable weight to a treating physician's medical opinion if the opinion is supported by the evidence and consistent with the doctor's records. *See Winschel*, 631 F.3d at 1179. An ALJ may refuse to give the opinion of a treating physician "substantial or considerable weight . . . [if] 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* at 1240-41; *see also Crawford*, 363 F.3d at 1159. The

ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 931 (11th Cir. 2013) (internal quotation and citation omitted).

Dr. Prelipcean has treated Mr. Nappier since 2009. (Doc. 6-12, p. 2). In September 2014, Dr. Prelipcean completed a physical capacities evaluation on behalf of Mr. Nappier. (Doc. 6-15, pp. 56-57). Dr. Prelipcean opined that Mr. Nappier could sit for three hours, stand for two hours, and walk for two hours at one time; sit for six hours, stand for three hours, and walk for four hours total in an eight hour work day; lift up to twenty-five pounds occasionally and up to ten pounds frequently; carry up to twenty-five pounds occasionally; use both arms, hands, legs, and feet to push and pull frequently; use both hands for simple grasping, fine manipulation, and fingering/handling frequently; bend and squat occasionally; reach frequently; and never crawl or climb. (Doc. 6-15, pp. 56-57). Dr. Prelipcean placed "moderate" restrictions on activities involving unprotected heights and "mild" restrictions involving moving machinery, changes in temperature and humidity, driving automotive equipment, and dust, fumes, and gases. (Doc. 6-15, p. 57).

The ALJ gave little weight to Dr. Prelipcean's physical capacities evaluation. (Doc. 6-3, p. 20). The ALJ found that the evaluation is of "limited utility" because it is a "checked box or circle form[] without findings that are

supported by the record." (Doc. 6-3, p. 20). Additionally, the ALJ found that Dr. Prelipcean appeared to "rely too heavily on the claimant's subjective complaints as the objective evidence of mild multilevel degenerative dis[c] disease simply does not support a reduction to a light exertional level even when combined with the stable findings on Dr. Prelipcean's examinations of the claimant." (Doc. 6-3, p. 20). Substantial evidence supports the ALJ's decision to give little weight to Dr. Prelipcean's opinion.

Dr. Prelipcean circled the numbers of hours Mr. Nappier is able to sit, stand, and walk, and checked boxes when placing weight and other restrictions on Mr. Nappier's physical capabilities, but Dr. Prelipcean did not provide a medical basis for his determination when given the opportunity to do so. (Doc. 6-15, pp. 55-56). Therefore, the ALJ, in the exercise of her discretion, could discount the restrictions that Dr. Prelipcean identified. *See Spencer on Behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985) (explaining that an ALJ may afford little weight to a physician's opinion when the physician has "merely checked boxes on a form without explaining how he reached his conclusions"); *see also* 20 CFR 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

Moreover, there are inconsistencies between the objective medical evidence and the limitations that Dr. Prelipcean identified. (*See* Doc. 6-12, pp. 13, 17, 20, 30, 35, 39, 44, 59, 60; Doc. 6-14, pp. 21, 22, 50, 51, 53; Doc. 6-15, pp. 30, 32, 38, 45). Although Dr. Prelipcean reported that Mr. Nappier experienced muscle spasms, tenderness, and a limited range of motion, Dr. Prelipcean did not restrict Mr. Nappier's activity, and Dr. Prelipcean prescribed a conservative treatment regimen. (Doc. 6-12, pp. 13, 16, 17, 19, 20, 23, 25, 29, 30, 33, 35, 39, 42, 44, 45-47, 50; Doc. 6-14, p. 20; Doc. 6-15, pp. 30, 32, 45). Functional limitations accompanying clinical findings are necessary in determining disability. *See McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) ("[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality"); *see also* 20 C.F.R § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities.").

Mr. Nappier argues that Dr. Ernst's report is consistent with Dr. Prelipcean's opinion. (Doc. 11, p. 11). Dr. Ernst examined Mr. Nappier in June 2013 at the request of the Social Security Administration. (Doc. 6-14, pp. 19-23). Dr. Ernst opined that Mr. Nappier could stand for up to four hours, walk up to four hours, and sit up to six hours total. (Doc. 6-14, p. 23). He also opined that Mr. Nappier

did not require assistive devices. (Doc. 6-14, p. 23). Dr. Ernst found that Mr. Nappier can lift ten pounds occasionally and five pounds frequently; climb steps frequently and ladders occasionally; stoop frequently; and crouch, kneel, and crawl occasionally. (Doc. 6-14, p. 23). Dr. Ernst opined that Mr. Nappier can participate in fine and gross manipulative activities frequently, "except both hands have decreased sensation so that will affect the ability to feel." (Doc. 6-14, p. 23). Dr. Ernst found "[n]o limitations for hearing, speaking, or traveling," but he noted that "hazards has limitations" because of decreased sensation in Mr. Nappier's hands. (Doc. 6-14, p. 23).

Although Dr. Ernst's opinion may be somewhat consistent with Dr. Prelipcean's opinion, substantial evidence supports the ALJ's decision to give little weight to Dr. Ernst's opinion. (Doc. 6-3, p. 20). The ALJ found that, like Dr. Prelipcean, Dr. Ernst relied too heavily on Mr. Nappier's subjective complaints of pain. (Doc. 6-3, p. 20). The ALJ also found that Dr. Ernst's opinion was inconsistent with his own clinical findings and other objective medical evidence contained in the record. (Doc. 6-3, p. 20).

Dr. Ernst's opinion regarding Mr. Nappier's physical capabilities is inconsistent with his finding that Mr. Nappier maintained full range of motion of the spine and full motor strength in all extremities during his physical examination. (Doc. 6-12, pp. 21-22). Although Dr. Ernst noted that Mr. Nappier had an achy

low back pain during the straight leg raising test on his left leg, he also found that Mr. Nappier had a normal gait and heel-to-toe walk, negative Romberg, and negative straight leg raising on the right leg. (Doc. 6-12, pp. 21-22).

Dr. Ernst's opinion is also inconsistent with the objective medical record as a whole. (Doc. 6-12, pp. 13, 17, 20, 30, 35, 39, 44, 47, 59, 60; Doc. 6-14, pp. 21, 22, 50, 51, 53; Doc. 6-15, pp. 30, 32, 38, 40, 38, 45). Specifically, his opinion is inconsistent with Mr. Nappier's MRIs which revealed only mild degenerative changes, no fractures, and no disc herniation, spinal canal stenosis, or nerve impingement. (Doc. 6-12, pp. 14, 30, 59, 60; Doc. 6-14, p. 53). The ALJ noted that "[i]n fact, [Mr. Nappier's] degenerative dis[c] disease would only be severe when considering the tenderness and some limited range of motion found by the claimant's primary care provider," Dr. Prelipcean. (Doc. 6-3, p. 20).

Accordingly, substantial evidence supports the ALJ's decision to give little weight to Dr. Prelipcean's opinion. *See Crawford*, 363 F.3d at 1159-61 (finding that substantial evidence supported the ALJ's decision to discredit the opinions of the claimant's treating physicians where those physicians' opinions regarding the claimant's disability were inconsistent with the physicians' treatment notes and unsupported by the medical evidence); *see also Roth v. Astrue*, 249 Fed. Appx. 167, 168 (11th Cir. 2007) (finding that substantial evidence supported the ALJ's determination that the treating physician's opinion "should not be assigned

substantial weight because it was inconsistent with the record as a whole and not supported by the doctor's own medical records.").

## V.    CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards. The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner decision denying benefits. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this May 31, 2017.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE